IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| YOHANN PALMER-TESEMA,<br><br>Petitioner,<br><br>vs.<br><br>DOUGLAS FENDER, Warden<br><br>Respondent. | CASE NO. 1:21-CV-1083-JRK<br><br>JUDGE JAMES R. KNEPP II<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

On May 25, 2021, Petitioner Yohann Palmer-Tesema, a prisoner in state custody, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). On December 8, 2021, Respondent Douglas Fender, in his official capacity as Warden of the Lake Erie Correctional Institution (hereinafter, the State), filed a Return of Writ that included the state court record. (ECF #7). Mr. Palmer-Tesema filed a Traverse to Return of Writ on July 8, 2022. (ECF #12).

The District Court has jurisdiction over the petition under § 2254(a). On May 25, 2021, this matter was referred to me pursuant to Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of May 25, 2021). As explained below, I recommend the District Court **DENY** any relief on Grounds One, Four, and Five, and **DISMISS** Grounds Two and Three as not cognizable in federal habeas corpus. I further conclude that an evidentiary hearing is neither warranted nor necessary. Finally, I recommend the District Court **DENY** Mr. Palmer-Tesema a certificate of appealability (COA) as to all grounds.

1

PROCEDURAL HISTORY

**A.  Factual findings of the Court of Appeals**

The Ohio Court of Appeals, Eighth Appellate District, set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Mr. Palmer-Tesema rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Eighth District determined as follows:

> {¶ 2} In March 2018, Palmer-Tesema was named in a nine-count indictment related to crimes committed against three women — S.L., N.D., and M.C. Pertaining to S.L., he was charged with two counts of rape (vaginal and anal intercourse) and one count of kidnapping. As related to N.D., Palmer-Tesema was charged with one count of rape (digital penetration) and one count of kidnapping. Relating to M.C., he was charged with three counts of rape (digital penetration, vaginal intercourse, and cunnilingus) and one count of kidnapping. All charges contained a sexually violent predator specification, and the kidnapping charges carried a sexual motivation specification.

> {¶ 3} Prior to trial, Palmer-Tesema filed a motion for relief from prejudicial joinder, seeking separate trials for the counts pertaining to each victim. The state opposed the motion, and following a hearing, the trial court denied Palmer-Tesema's motion to sever.

> {¶ 4} The matter was tried before a jury except for the sexual predator specifications, which were tried to the bench.

> #### A.  The Trial

> {¶ 5} Three women, S.L., N.D., and M.C., each were raped by Palmer-Tesema. Although the rape of each woman was a separate and distinct incident, taken together, they occurred close in time and bear factual similarities. The rapes occurred between November 22, 2017 and January 14, 2018, and each were committed at Palmer-Tesema's house, in his bed, and in spite of each victim's substantial impairment and lack of consent.

> #### 1. S.L. — November 22, 2017

> {¶ 6} S.L. testified that on November 22, 2017, the night before Thanksgiving, she went out with her friends to the West End Tavern ("West End") in Lakewood, Ohio. Prior to arriving at the bar, S.L. consumed six beers and shared half of a box of wine.

2

She admitted it was not uncommon for her to consume this much alcohol at least once a week.

{¶ 7} She testified that when she arrived at the West End she was "definitely feeling tipsy" and had "started going in and out." She clarified that she was "on the verge of blacking out," — characterizing it as a "brownout." At the bar, one of her friends bought her a shot. S.L. did not recall if she had other drinks at the bar aside from the shot, but said it was the last thing she remembered that evening.

{¶ 8} In the morning, S.L. woke up, still drunk, and in a house she did not recognize. She was in bed with Palmer-Tesema, whom she recognized from high school but had not seen for a year. According to S.L., they were never friends. She testified that she was confused and naked from the waist down. She noticed that the bed was wet underneath her, which she thought at the time could be urine. Her hearing processor device and cell phone were beside the bed, but she could not locate her purse. She asked Palmer-Tesema if they had sex. He denied it, claiming nothing happened. S.L. found her underwear and pants, got dressed, and texted her brother. She stated she was still drunk and everything was blurry.

{¶ 9} S.L.'s brother, D.L., testified that he woke up Thanksgiving morning and saw a text message sent by his mother stating that S.L. had not come home. He also saw two text messages sent at 1:51 a.m. from S.L.'s cell phone that read " [S.L.'s] sleeping at my place this is yohann [sic]," and "I live in bay village [sic]." D.L. responded to the message at 6:59 a.m.: "whew thanks man. she awake now? and okay? [sic]." He testified that he tried to locate Palmer-Tesema's address to find his sister. Around 8:30 a.m. he received a text message from S.L. stating that she was okay; he picked her up shortly thereafter.

{¶ 10} S.L. testified that she went to the bathroom at her brother's house and noticed that her vagina was "very stretched out" and that she felt "very sore all over" her body. She testified that it was painful to urinate. She began crying and immediately told her brother that something happened — "he did something to me."

{¶ 11} D.L. drove S.L. to the NORD Center in Lorain and a sexual examination was performed by Amanda McCall, a sexual assault nurse examiner ("SANE"). S.L. told McCall that Palmer-Tesema raped her the night before. McCall testified that she found bruising to S.L.'s inner thigh and calf. According to McCall, the bruising was consistent with finger marks. McCall also testified that she noted the presence of white discharge in S.L.'s vaginal cavity, which could be consistent with semen. A toxicology screen was also performed and the results revealed that at 1:30 p.m., which was approximately 12 hours after she stopped drinking, S.L. had a blood-alcohol content of 0.165.

3

{¶ 12} S.L. testified that later that evening she felt pain in her anus and was unable to have a bowel movement. At that time, she told her parents what happened, and the following morning they took her to Fairview Hospital and then to the Bay Village Police station to report the rape.

{¶ 13} Salesha Baksh ("Baksh"), a forensic DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, tested swabs taken from S.L.'s rape kit. She testified that Palmer-Tesema's DNA was a match for the DNA found on the swabs taken from inside of the crotch area of S.L.'s underwear.

{¶ 14} The state pieced S.L.'s night together through the West End's surveillance video recordings and the testimonies of (1) a West End bartender, (2) the Uber driver who accepted S.L.'s Uber request, and (3) Palmer-Tesema's roommates and friends.

{¶ 15} The jury watched the surveillance video and saw S.L's interactions at the bar prior to leaving with Palmer-Tesema, including talking to unknown men. The state also presented the testimony of the West End bartender who stopped serving S.L. alcohol due to her intoxicated state. The Uber driver who drove Palmer-Tesema and S.L. to S.L.'s parent's house, then to Palmer-Tesema's house, testified about the couple's interactions during the ride, including that they were kissing. The state also presented testimony from two of Palmer-Tesema's roommates who described S.L. and Palmer-Tesema's behavior after they arrived at their house. Finally, Palmer-Tesema's friend testified that Palmer-Tesema "kind of bragged" to her on Thanksgiving night that the night before, "he slept with a girl he didn't want to, but she started taking her clothes off so he had to do it."

{¶ 16} The jury also heard testimony from the investigating detectives and listened to Palmer-Tesema's initial interview with police denying any sexual conduct with S.L., even though she "wanted to" but he did not because she was way too drunk and he was not attracted to her. He told them that she slept in his bed, and he slept on the couch.

## 2. N.D. — November 29, 2017

{¶ 17} N.D. testified that she met Palmer-Tesema through their mutual friend, M.C. (the third victim). N.D. explained that she "tolerated" Palmer-Tesema, considering him to be more of an acquaintance. She was better friends with other members of the group and stated she would hang out with Palmer-Tesema only if he was with other friends. According to N.D. "[w]e were all friends," who hung out at Palmer-Tesema's house in Bay Village and referred to it as the "Bay house." She told the jury that they all just slept in the beds that were open or on couches or the floor and were able to leave the next day without having to drive. N.D. estimated that she had slept in Palmer-Tesema's bed around three to five times, but that he was never in the bed with her.

4

{¶ 18} On November 29, 2017, N.D. and her friend Tia McCord drank at the Bay house for several hours prior to going to bars, including the West End. She remembered having five to seven mixed drinks and three to four shots. She testified that she did not remember leaving the West End. She recalled being back at the Bay house and being "very drunk" before going to sleep in Palmer-Tesema's bed, alone, and fully clothed. N.D. testified that she awoke lying flat on her stomach and to somebody vaginally penetrating her from behind; she eventually realized it was Palmer-Tesema. She did not recall saying or doing anything in response. N.D. was awakened when McCord came into the bedroom the next morning and she realized she was naked from the waist down. N.D. got dressed and left with her friend.

{¶ 19} N.D. told the jury that she did not initially go to the police or report the sexual assault because it was "not registering" to her as a sexual assault. However, after speaking with the Bay Village Police about Palmer-Tesema sexually assaulting M.C., she decided to come forward. She testified that she never consented to have sex with Palmer-Tesema.

### 3. M.C. — January 14, 2018

{¶ 20} M.C. testified that at one point in time she was "very close" friends with Palmer-Tesema and one of his roommates. She would "hang out" at the Bay house three times a week. M.C. explained that she and others in the group, including N.D., would drink excessively and then sleep at the Bay house. M.C. testified that she would "just typically crash on the couch."

{¶ 21} M.C. told the jury that in the summer of 2017, Palmer-Tesema wanted to be more than friends but she did not. She stated that on two prior occasions, Palmer-Tesema kissed her without her permission but he was respectful when she told him to stop each time.

{¶ 22} M.C. testified that on January 14, 2018, she had been "day drinking." She explained that she had her first drink around 11:30 a.m., and continuously drank for the entire day. This included an unknown number of drinks at the West End Tavern. M.C. explained "I don't remember because I was drunk. I remember where I was and who I was with but at that point I don't really remember the context of conversation or how many drinks I had had." That night, M.C. exchanged text messages with Palmer-Tesema and decided to stay the night at the Bay house.

{¶ 23} She remembered talking to Palmer-Tesema in the kitchen and then waking up with her face in the toilet, unsure if she had vomited. She recalled crawling up the stairs and going directly to Palmer-Tesema's bed. She testified that she fell asleep fully-clothed, and that her next memory was waking up and realizing that Palmer-Tesema's fingers were inside her vagina. She also stated that Palmer-Tesema was

having sex with her despite her telling him multiple times to stop. She testified that she was still drunk at that point and was unsure whether she lost consciousness during the sexual encounter. M.C. next recalled waking up naked from the waist down and that Palmer-Tesema's hand was inside her bra. She found her clothes, got dressed, and left.

{¶ 24} The jury read text messages between her and Tia McCord, in which M.C. stated that Palmer-Tesema "borderline raped me." M.C. did not report the rape to police until another one of her friends, Leah, encouraged her to do so on January 18, 2018. Following the report and advice of the investigating detective, M.C. went to NORD for a rape-kit examination.

{¶ 25} SANE Nurse Denise Miller, testified that she performed M.C.'s rape-kit examination and observed bruising to M.C.'s abdomen, hips, and buttocks. A speculum and a toluidine blue dye exam were conducted, revealing a small laceration to the vulva. According to Miller, the laceration is consistent with vaginal penetration but it does not reveal whether consensual or nonconsensual activity occurred.

{¶ 26} Forensic analyst and expert Baksh also testified that she performed and analyzed the DNA from M.C.'s rape kit. According to Baksh, a swab taken from the inside crotch area of M.C.'s underwear revealed a mixture of DNA. Accordingly, additional Y-STR testing, which focuses solely on the Y-chromosome to isolate male DNA in the sample, was performed on the swab. Christine Scott, a forensic DNA analysis with the Cuyahoga County Regional Forensic Science Laboratory, performed the additional testing and testified that she found that the major Y-STR DNA component in the sample was Palmer-Tesema's.

### 4. The Defense's Case

{¶ 27} Palmer-Tesema testified. He admitted that alcohol was involved and that each woman slept in his bed. He further claimed that he participated in consensual sexual conduct with M.C. and N.D., but denied that any sexual activity occurred with S.L.

{¶ 28} In his defense, two of his friends testified regarding the interactions between Palmer-Tesema and S.L. and M.C. His friend Reynaldo testified that he was at the West End on November 22, 2017, and saw S.L and Palmer-Tesema together, and that S.L. was kissing Palmer-Tesema's neck.

{¶ 29} On January 14, 2018, Reynaldo was at the Bay house playing cards when M.C. came over. According to Reynaldo, M.C. and Palmer-Tesema were in the kitchen talking, and M.C. was sitting on the kitchen counter with her legs around Palmer-Tesema. He stated that when he and his friends came back from getting pizza, he did not see them again.

{¶ 30} Palmer-Tesema's friend Tyler testified that on November 30, 2017, he was with N.D., McCord, and Palmer-Tesema and they were all drinking. According to Tyler, he was initially sleeping in the same bed with Palmer-Tesema but he left when McCord and N.D. came into the room, and N.D. got into the bed with Palmer-Tesema. He testified that he also witnessed M.C. being affectionate toward Palmer-Tesema on January 14, 2018.

### B. The Verdict and Sentence

{¶ 31} The jury found Palmer-Tesema guilty of all charges, including the sexual motivation specifications. Following the jury verdict and prior to sentencing, the state dismissed the sexually violent predator specifications. After merging allied offenses, the trial court imposed an aggregate prison term of 17 years.

(ECF #7-1 at PageID 226-60 (footnote and citations omitted); *see also State v. Palmer-Tesema*, No. 107972, 2020 WL 1227902 (Ohio Ct. App. March 12, 2020), *appeal not allowed*, 154 N.E.3d 99 (Ohio 2020) (table) (*Palmer-Tesema I*)).

## B.   State court conviction and sentence

On March 20, 2018, a Cuyahoga County Grand Jury returned a nine-count indictment against Mr. Palmer-Tesema, charging him as follows:

| Count | Offense | Revised Code | Victim | Method | Specification(s) | Offense Date |
|-------|---------|--------------|--------|--------|------------------|--------------|
| 1 | Rape | § 2907.02(A)(1)(c) | Jane Doe I[1] | Vaginal intercourse | Sexually violent predator | 11/22/17 |
| 2 | Rape | § 2907.02(A)(1)(c) | Jane Doe I | Anal penetration | Sexually violent predator | 11/22/17 |
| 3 | Kidnapping | § 2905.01(A)(4) | Jane Doe I | N/A | Sexual motivation; sexually violent predator | 11/22/17 |
| 4 | Rape | § 2907.02(A)(1)(c) | Jane Doe II[2] | Digital penetration of vagina | Sexually violent predator | 11/29/17 |
| 5 | Kidnapping | § 2905.01(A)(4) | Jane Doe II | N/A | Sexual motivation; sexually violent predator | 11/29/17 |

---

[1]     Later amended to the victim's full name; her initials are S.L. (ECF #7-2 at PageID 533).

[2]     Later amended to the victim's full name; her initials are N.D. (ECF #7-2 at PageID 533).

7

| Count | Offense | Revised Code | Victim | Method | Specification(s) | Offense Date |
|-------|---------|--------------|--------|--------|------------------|--------------|
| 6 | Rape | § 2907.02(A)(1)(c) | Jane Doe III[3] | Digital penetration of vagina | Sexually violent predator | 1/14/2018 |
| 7 | Rape | § 2907.02(A)(1)(c) | Jane Doe III | Vaginal intercourse | Sexually violent predator | 1/14/2018 |
| 8 | Rape | § 2907.02(A)(1)(c) | Jane Doe III | Cunnilingus | Sexually violent predator | 1/14/2018 |
| 9 | Kidnapping | § 2905.01(A)(4) | Jane Doe III | N/A | Sexual motivation; sexually violent predator | 1/14/2018 |

(ECF #7-1 at PageID 121-25). He was arraigned on March 23, 2018 and, through appointed counsel, pled not guilty to all counts. (*Id.* at PageID 126). On May 3, 2018, prior counsel withdrew and the trial court appointed new counsel. (*Id.* at PageID 127).

On October 16, 2018, new counsel filed a Motion for Relief from Prejudicial Joinder, seeking severance "of the above captioned incidents so that each may be tried separately, fairly, and in accord with the Constitutional rights to which each is entitled." (*Id.* at PageID 128-30). The State opposed (*id.* at PageID 133-42), and on October 22, 2018, after a hearing, the trial court denied the motion (*id.* at PageID 143). Mr. Palmer-Tesema then waived his right to a jury trial on the sexually violent predator specifications in Counts 1 through 9, electing to have those decided by the trial judge. (*Id.* at PageID 144).

Trial began on October 30, 2018. (ECF #7-2 at PageID 534). During its case-in-chief, the State moved to amend Count 4 to correct the victim's date of birth and to change the sexual conduct from digital penetration of N.D.'s vagina to vaginal intercourse, both based on testimony N.D. previously provided. (*Id.* at PageID 1522). Mr. Palmer-Tesema did not object to the former

---

[3]        Later amended to the victim's full name; her initials are M.C. (ECF #7-2 at PageID 533).

amendment but did object to the latter. (*Id.* at PageID 1523). Relying on case law provided by the State, the trial court allowed both amendments. (*Id.*).

After the State rested, Mr. Palmer-Tesema moved for a judgment of acquittal under Rule 29 of the Ohio Rules of Criminal Procedure, which the trial court denied. (ECF #7-1 at PageID 145; ECF #7-2 at PageID 1594-99). Mr. Palmer-Tesema renewed his Rule 29 motion following the close of evidence, which the trial court again denied. (ECF #7-2 at PageID 1712-13). Defense counsel also renewed a motion for mistrial based on prejudicial joinder. (*Id.* at PageID 1713). Again, the trial court denied any relief. (*Id.* at PageID 1714). On November 7, 2018, the jury returned a verdict of guilty on all counts, including the sexually motivated offense specifications for each kidnapping count. (ECF #7-1 at PageID 146).

At sentencing, the State dismissed the sexually violent predator specifications. (ECF #7-2 at PageID 1850). The trial court merged Counts 1 and 3, Counts 4 and 5, and Counts 6 and 9. (ECF #7-1 at PageID 147). The State elected to sentence on the rape charges, and the trial court then imposed the following sentence:

- Count 1: 5 years
- Count 2: 6 years
    - Both counts to run concurrent

- Count 4: 5 years

- Count 6: 4 years
- Count 7: 5 years
- Count 8: 6 years
    - All counts to run concurrent

- The 6 years combined in Counts 1 and 2, and the 5 years in Count 4, and the 6 years combined in Counts 6, 7, and 8 are to run consecutive for a total of 17 years in prison.

(*Id.*).

9

C.     **Direct appeal**

On December 11, 2018, through new appellate counsel, Mr. Palmer-Tesema appealed to the Eighth District. (ECF #7-1 at PageID 150-51). In his Appellant's Brief, he raised the following assignments of error:

> **First Assignment of Error**: It is improper to join separate charges when the issues and facts are not separate and distinct. In such case, if the jury is likely to confuse which evidence relates to which charge, it is prejudicial error to join the cases.
>
> **Second Assignment of Error**: The trial court erred by providing the jury with a "sleep" instruction pursuant to the charge of Rape, R.C. § 2907.02(A)(1)(c).
>
> **Third Assignment of Error**: The trial court erred by permitting the state to amend the indictment during the trial on a material element of an offense.

(*Id.* at PageID 169, 176, 181). The State opposed. (*Id.* at PageID 186-225). On March 12, 2020, the Eighth District affirmed, with one judge dissenting. (*Id.* at PageID 226-60; *Palmer-Tesema I*, 2020 WL 1227902, at *11).

On March 23, 2020, through new counsel, Mr. Palmer-Tesema sought reconsideration and reconsideration *en banc* from the Eighth District. (ECF #7-1 at PageID 262-74). Again, the State opposed. (*Id.* at PageID 276-87). The Eighth District denied Mr. Palmer-Tesema's request for reconsideration on April 14, 2020 (*id.* at PageID 288) and his request for reconsideration *en banc* on August 31, 2020 (*id.* at PageID 290).

On July 14, 2020, Mr. Palmer-Tesema appealed the Eighth District's March 12, 2020 decision to the Supreme Court of Ohio. (*Id.* at PageID 291). In light of the COVID-19 pandemic, the Supreme Court of Ohio accepted Mr. Palmer-Tesema's delayed appeal. (*Id.* at PageID 299). In his memorandum in support of jurisdiction, Mr. Palmer-Tesema asserted the following:

**First Proposition of Law**: It is improper to join separate charges when the issues and facts are not separate and distinct. In such cases, if the jury is likely to confuse which evidence relates to which charged, it is prejudicial error to join the cases.

**Second Proposition of Law**: The trial court erred by providing the jury with a "sleep" instruction pursuant to the charge of rape, R.C. 29078.01(A)(1)(c).

**Third Proposition of Law**: The trial court erred by permitting the State to amend the indictment during the trial on a material element of the offense.

(*Id.* at PageID 302) (cleaned up). The State filed a brief in opposition to jurisdiction (*id.* at PageID 352-69), and on October 13, 2020, the Supreme Court of Ohio declined jurisdiction (*id.* at PageID 370; *State v. Palmer-Tesema*, 154 N.E.3d 99 (Ohio 2020) (table)).

## D.    Ohio Appellate Rule 26(B) application for reopening

On June 9, 2020, through new appellate counsel, Mr. Palmer-Tesema filed an Application for Reopening Pursuant to Appellate Rule 26(B) in the Eighth District. (ECF #7-1 at PageID 371-98). The application raised two assignments of error, as follows:

**First Assignment of Error**: Appellate counsel was ineffective for failing to assign as error that Appellant's rape and kidnapping convictions were not supported by sufficient evidence.

**Second Assignment of Error**: Appellate counsel was ineffective to assign as error trial ineffectiveness for failure investigate Defendant's case, interview potential witnesses, trial and obtain evidence for present at trial.

(*Id.* at PageID 374, 384) (cleaned up). He later filed an Amended Application to comply with the Eighth District's order regarding page limitations, but it raised no new assignments of error. (*Id.* at PageID 399-420). The State opposed the application (*id.* at PageID 422-32), and on September 1, 2020, the Eighth District denied the application (*id.* at PageID 433-47; *see also State v. Palmer-Tesema*, No. 107972, 2020 WL 5242459 (Ohio Ct. App. Sept. 1 2020) (*Palmer-Tesema II*)).

On October 5, 2020, proceeding *pro se*, Mr. Palmer-Tesema filed a Notice of Appeal and Memorandum in Support of Jurisdiction with the Supreme Court of Ohio. (*Id.* at PageID 448-84). The Memorandum in Support of Jurisdiction reiterated the same errors assigned in his Rule 26(B) application, as follows:

> **Proposition of Law No. I**: Appellate counsel was ineffective for failing to assign as error that Appellant's rape and kidnapping convictions were not supported by sufficient evidence.

> **Proposition of Law No. II**: Appellate counsel was ineffective for failing to assign as error trial court's ineffectiveness for failure to fully investigate Defendant's case, failure to interview potential witnesses, prepare for trial and obtain evidence for defendant to present at trial.

(*Id.* at PageID 452). The Supreme Court of Ohio declined jurisdiction on December 15, 2020. (*Id.* at PageID 485; *see also State v. Palmer-Tesema*, 159 N.E.3d 286 (table)). He did not pursue an appeal to the United States Supreme Court; instead, five months later, he filed this petition.

### FEDERAL HABEAS CORPUS

Before this Court, Mr. Palmer-Tesema asserts five grounds for relief, as follows:

**Ground One**: It is improper to join separate charges when the issues and facts are not separate and distinct. In such cases, if the jury is likely to confuse which evidence relates to which charge, it is prejudicial error to join the cases.

**Ground Two**: The trial court erred by providing the jury with a "sleep instruction" pursuant to the charge of rape, R.C. § 2907.02(A)(1)(c).

**Ground Three**: The trial court erred by permitting the State to amend the indictment during the trial on a material element of an offense.

**Ground Four**: Appellate counsel was ineffective for failing to assign as error that Petitioner's rape and kidnapping convictions were not supported by sufficient evidence.

**Ground Five**: Appellate counsel was ineffective for failing to assign as error trial court's ineffectiveness for failure to fully investigate Defendant's case, failure to

> interview potential witnesses, prepare for trial and obtain evidence for Defendant to present at trial.

(ECF #1 at PageID 22, 30, 33, 36, 43) (cleaned up). His petition included a supporting memorandum setting forth the supporting facts and law as to each ground. (*Id.* at PageID 18-48). He requests this Court "grant this Writ of Habeas Corpus petition and/or at least hold an Evidentiary Hearing so that the evidence may be presented before this Court thereby giving this Court a first-hand review of the evidence." (*Id.* at PageID 15).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Palmer-Tesema's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established

13

federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

A state court decision involves an unreasonable application of the Court's precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). "It bears repeating that even a strong case for

14

relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18.

Under federal law, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers, including exhaustion of state remedies and procedural default, limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Put simply, federal courts may review federal claims that were evaluated on the merits by a state court. Claims there were not evaluated on the merits, either because they were never presented to the state courts (*i.e.*, they are unexhausted) or because they were not properly presented to the state courts (*i.e.*, they are procedurally defaulted), are generally not cognizable on federal habeas review. *Bonnell v. Mitchel*, 301 F. Supp. 2d 698, 722 (N.D. Ohio Feb. 4, 2004).

**Exhaustion of Available State Court Remedies**. A court may not grant a petition for habeas corpus unless it appears the petitioner has exhausted available state court remedies, state corrective process is unavailable, or circumstances exist rendering such state process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b)(1). Typically, the exhaustion requirement is satisfied when the petitioner fairly presents all claims to the highest court in the state in where petitioner was convicted, giving the state a full and fair opportunity to rule on the petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). A claim is fairly presented when both the factual and legal basis for the claim has been introduced to the state courts. *Fulcher v. Motley*, 444

F.3d 791, 798 (6th Cir. 2000). A failure to exhaust applies only where state remedies remain "available at the time of the federal petition." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). In contrast, where state court remedies are no longer available, procedural default (discussed more fully below), rather than exhaustion, applies. *Id.*

**Procedural Default**. Absent a petitioner demonstrating either cause and prejudice or that failure to review the claim would result in a fundamental miscarriage of justice (discussed below), a federal court will not consider the merits of procedurally defaulted claims. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

There are two avenues by which a petitioner's claim may be procedurally defaulted. *Williams*, 460 F.3d at 806. First, procedural default occurs if a petitioner "fails to comply with state procedural rules in presenting his claim to the appropriate state court." *Id.* To determine whether a petitioner's failure to comply with a state procedural rule bars review of his habeas claims, courts in the Sixth Circuit perform a four-pronged analysis: (1) whether there is a state procedural rule applicable to petitioner's claim and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Second, a claim may be procedurally defaulted when the petitioner fails to raise it in state court and pursue it through the state's "ordinary appellate review procedures." *Williams*, 460 F.3d at 806 (citing *O'Sullivan*, 526 U.S. at 848 (1991)); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661

(N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). As addressed above, "[i]f, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Id.* Although the exhaustion requirement is satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson,* 501 U.S. 722, 732 (1991), the petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims barring federal court review. *Williams,* 460 F.3d at 806; *Shinn v. Ramirez,* 142 S. Ct. 1718 (2022) ("When [a state prisoner] has failed to [first present that claim to the state court in accordance with state procedures], and the state court would dismiss the claim on that basis, the claim is 'procedurally defaulted.'").

To overcome a procedural bar, a petitioner must show cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 749. Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million,* 399 F.3d 796, 806 (6th Cir. 2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.,* 327 F.3d 448, 452 (6th Cir. 2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation omitted)). A finding of cause and prejudice does not entitle a petitioner to habeas relief; it only allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted. *See Martinez v. Ryan,* 566 U.S. 1, 10 (2012); *see also Coleman,* 501 U.S. at 750.

A showing of cause for the default requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 488; *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012). Neither a petitioner's pro se status nor his ignorance of the law and procedural filing requirements are enough to establish cause to overcome procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Furthermore, futility cannot constitute cause for the procedural default of a claim for failure to raise a claim on direct review if it means simply that a claim was "unacceptable to that particular court at that particular time." *Engle*, 456 U.S. at, 130, n.35.

To demonstrate prejudice sufficient to overcome procedural default, a petitioner must show more than mere errors in the state trial creating a possibility of prejudice; rather, the petitioner must show that the alleged errors worked to the petitioner's actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions. *Murray*, 477 at 494. There is no prejudice where the petitioner does not show a reasonable probability that the result of the proceeding would have been different. *Ambrose v. Booker*, 801 F.3d 567, 577-78 (6th Cir. 2015).

Alternatively, a petitioner may overcome procedural default by showing that a fundamental miscarriage of justice will occur if the claims are not considered. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 495. A fundamental miscarriage of justice occurs in the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 495-96; *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995). Actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623

(1998). A valid actual innocence claim must be supported by new reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial that is so strong a court cannot have confidence in the outcome of the petitioner's trial. *Schlup*, 513 U.S. at 324. In other words, a "petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

**State Law Claims Not Cognizable on Federal Habeas Review.** The District Court will not have jurisdiction over a petitioner's claims for purposes of habeas corpus review if the claims do not "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."). Moreover, merely asserting that a state law error violates the Federal Constitution is not sufficient to justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).

Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state

rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

### Discussion and Analysis

In its Return of Writ, the State argues Grounds One, Two, and Three are not cognizable in federal habeas corpus because each raises an issue of state law only, and Mr. Palmer-Tesema had a full and fair opportunity to litigate these claims in Ohio state court. (ECF #7 at PageID 84, 92, 95). It also contends that if considered on the merits, each ground fails. (*Id.*). Finally, the State maintains that the Eighth District's rejection of the merits of Mr. Palmer-Tesema's Rule 26(B) Application forecloses Grounds Four and Five as a basis for federal habeas relief due to procedural default. (*Id.* at PageID 98, 111).

Upon review, I concur with the State's analysis in some respects, but disagree in others. But I ultimately conclude that Mr. Palmer-Tesema is not entitled to any relief, including an evidentiary hearing or a COA.

21

I.      **Ground One provides no basis for habeas relief**

In Ground One, Mr. Palmer-Tesema argues the trial court impermissibly allowed the State to join multiple counts of offenses occurring on different days and involving different victims. (ECF #1 at PageID 22). He claims this deprived him of his constitutional right to a fair trial, prejudicing him by forcing him "to choose between exercising his Sixth Amendment right to testify [in] his own defense regarding N.D. and S.L. rape counts, and his Fifth Amendment right to remain silent on the M.C. rape counts." (*Id.* at 22, 29) (emphasis omitted).

Misjoinder of offenses can cause prejudice amounting to a violation of a defendant's right to a fair trial under the Fifth Amendment, but "[i]mproper joinder does not, in itself, violate the Constitution." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). The United States Supreme Court recognizes that joinder of offenses serves to "'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *Id.* at 449 (quoting *Bruton v. United States*, 391 U.S. 123, 134 (1968)). Thus, improper joinder only violates the Constitution when "it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Lane*, 474 U.S. at 446 n.8.

The Sixth Circuit has recognized two possible forms of prejudice that may result from misjoinder, as follows:

> (1) the failure to sever the charges put in conflict defendant's Sixth Amendment right to testify on his own behalf with his Fifth Amendment right to remain silent; and (2) the joinder of the two charges created prejudice so substantial as to deny him a fair trial under the Fifth Amendment due to the "bad-acts spillover" effect of combining two unrelated . . . charges, resulting in the likelihood that the jury would fail to consider the evidence of defendant's involvement in each [charge] separately.

22

*Collins v. Green*, 838 F. App'x 161, 168 (6th Cir. 2020). In his petition, Mr. Palmer-Tesema argues both forms of prejudice occurred during his trial. (*See* ECF #1-1 at PageID 24, 29). I address these claims in reverse order.

### A.    "Bad acts spillover"

As to the latter form of potential prejudice, the Eighth District thoroughly analyzed Mr. Palmer-Tesema's claim and rejected it, explaining at length:

**A. Joinder of Offenses**

{¶ 33} Prior to trial, Palmer-Tesema filed a motion for relief from prejudicial joinder, seeking separate trials for the counts pertaining to each woman because the underlying facts of each incident were such that presenting them together would confuse the jury and deny him a fair trial. Specifically, he contended that based on the nature of the offenses charged and the similarity of the factual scenarios underlying them, the jury would be influenced by any evidence of guilt as related to one victim and thereby use it to improperly infer guilt as related to another.

{¶ 34} The state opposed the motion, arguing that the joinder of offenses was proper because the evidence was simple and direct pertaining to each victim, the occurrences shared a common modus operandi, and the evidence of each sexual assault would likely be admissible under Evid.R. 404(B). Following a hearing, the trial court denied Palmer-Tesema's motion.

{¶ 35} On at least two different occasions during trial, Palmer-Tesema either renewed his motion for relief from prejudicial joinder or moved for a mistrial on the grounds of prejudicial joinder. The trial court denied each request.

{¶ 36} In his first assignment of error, Palmer-Tesema contends that the trial court abused its discretion when it denied his motion for relief from prejudicial joinder.

{¶ 37} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Ohio law favors joinder of offenses that meet the Crim.R. 8(A) requirements in a single trial. "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses."

{¶ 38} In this case, Palmer-Tesema does not dispute that joinder was proper under Crim.R. 8(A); rather, he contends that joinder was unduly prejudicial.

{¶ 39} Crim.R. 14 provides relief from prejudicial joinder. "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice requires." Crim.R. 14. "Severance may be warranted if the trial court finds a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." A defendant seeking severance must provide the trial court "'sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" The defendant "'bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance.'"

{¶ 40} If a defendant makes a claim for prejudicial joinder, "[t]he state may rebut a defendant's claim * * * in two ways." First, if the state shows that the evidence of each joined offense is "simple and direct" the defendant's claim of prejudice fails. Where the evidence of the joined offenses is "uncomplicated," such that the jury is "capable of segregating the proof" required to prove each offense, a defendant is not prejudiced by the joinder.

{¶ 41} The second way the state can refute prejudice is if the state could otherwise introduce evidence of the joined offenses at separate trials as "other acts" pursuant to Evid.R. 404(B). However, if the state can establish that the evidence of each offense is simple and direct, it need not establish that the evidence would be otherwise admissible under Evid.R. 404(B).

{¶ 42} Evidence is "simple and direct" if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." Courts have held that evidence of multiple offenses is "simple and direct" where, for example, the offenses involved different victims, different incidents or factual scenarios, and different witnesses. Thus, as this court has stated, "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof."

{¶ 43} In this case, Palmer-Tesema offers no evidence or support for his claim that he was prejudiced by the jury's consideration of the joined offenses. Instead, and without identifying any purportedly confusing evidence or demonstrating how the jury was confused, he generally argues that the evidence was "confusing," and the witnesses were "mixed" and "intertwined." Palmer-Tesema's bare allegations are insufficient to establish prejudice.

{¶ 44} The record before us does not reflect that prejudicial joinder occurred because the state presented simple and direct testimony relating to each of the three different victims. Each victim provided detailed testimony of the separate incidents, and the record reflects that the evidence pertaining to each victim in each offense is separate and distinct and could easily be segregated. Although the rapes may have occurred around the same approximate time, the state presented each witness's testimony separately so that there was no danger of confusing the evidence.

{¶ 45} The first nine witnesses presented to the jury testified regarding the events leading up to and the rape of S.L., including S.L.'s own testimony.

{¶ 46} Thereafter, the state called a forensic DNA analyst who testified that she analyzed evidence from both S.L.'s and M.C.'s rape kits. After a general introduction regarding the procedure for performing such an analysis, the analyst testified about specific aspects of S.L.'s rape kit, and the specific findings and conclusions relating solely to S.L. Following a recess "to clear our heads," the analyst then testified about the analysis, findings, and conclusions of M.C.'s rape kit, including that more specific testing was conducted.

{¶ 47} The next witness the state called was a toxicologist to discuss S.L.'s toxicology report revealing her level of intoxication the morning after the rape. Only S.L. submitted to a toxicology screen; thus the jury would not have been confused or unable to separate the findings. A second forensic DNA analyst testified next regarding the specific testing and analysis conducted on the foreign DNA discovered from M.C.'s rape kit.

{¶ 48} Thereafter, the state called three witnesses pertaining solely to the rape of M.C., including M.C. Following these witnesses, N.D. testified and a mutual friend of both M.C. and N.D. testified about her interactions with both victims.

{¶ 49} The final witness was the investigative detective whose testimony was direct and gave a detailed timeline and sequence of events from the beginning of his assignment of the case involving S.L., the investigative process, and the discovery of the incident involving M.C., which then lead to the discovery of the rape of N.D.

{¶ 50} Based on the foregoing, we find that the testimony and evidence was clearly distinguishable, easily separated, and not confusing.

{¶ 51} Furthermore, the state presented more than sufficient evidence with respect to each victim so that there is no danger that the jury convicted Palmer-Tesema based on an accumulation of evidence. In fact, Palmer-Tesema makes no argument on appeal that the evidence was insufficient to support any of the offenses charged.

{¶ 52} Moreover, the fact that the jury found Palmer-Tesema guilty of all counts does not support that the jury was confused or conflated the evidence. A trier of fact is considered "capable of segregating the proof of multiple charges when the evidence as to each of the charges is uncomplicated."

{¶ 53} Here, the testimony pertaining to each victim was not so complicated that it would potentially confuse the jury. These were not complicated events, and did not depend on complex circumstantial evidence. Two of the victims were able to recall the nonconsensual sexual conduct perpetrated by Palmer-Tesema. And although S.L. was unable to recall the sexual assault, DNA evidence substantiated her belief that Palmer-Tesema unlawfully engaged in sexual conduct with her.

{¶ 54} Finally, the jury was instructed to consider each count separately, and we presume that the jury followed the court's instructions. In this case, the trial court instructed the jury as follows:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict as to any other count.

> The defendant may be found guilty or not guilty of any one or all of the offenses charged.

We note that the jury did not submit any questions during deliberations, and nothing in the record reveals that the jury failed to follow the trial court's instructions.

{¶ 55} Accordingly, because joinder was proper and the evidence was simple and direct, Palmer-Tesema was not prejudiced by joinder, and the trial court did not abuse its discretion in denying the motion to sever. The first assignment of error is overruled.

(ECF #7-1 at PageID 236-44 (citations omitted); *see also Palmer-Tesema I*, 2020 WL 1227902, at *4-8).

Mr. Palmer-Tesema has not shown that the Eighth District's analysis of this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law or resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *See* 28 U.S.C. § 2254(d).

B.      **Sixth vs. Fifth Amendment concerns**

As to the other form of potential prejudice – that Mr. Palmer-Tesema had "to choose between exercising his Sixth Amendment right to testify [in] his own defense regarding N.D. and S.L. rape counts, and his Fifth Amendment right to remain silent on the M.C. rape counts" (ECF #1-1 at PageID 29) – I find no evidence that Mr. Palmer-Tesema properly raised this with the state courts at any level. Before the trial court, he advanced four reasons why joinder of the offenses was improper, but all focused on asserted prejudice and jury confusion. (ECF #7-1 at PageID 129-30). No mention was made of any alleged tension between his Fifth and Sixth Amendment rights.

Not much changed in his argument before the Eighth District, although in a conclusory statement regarding his First Assignment of Error, he asserted that by joining the various offenses, "the State violated Palmer-Tesema's right to a fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution." (ECF #7-1 at PageID 176). This is not enough to fairly present this claim to the state courts for their determination.

In asking the Eighth District to grant reconsideration or reconsideration *en banc*, Mr. Palmer-Tesema did not raise any Fifth or Sixth Amendment concerns. (*See* ECF #7-1 at PageID 262-87). The same is true with respect to his Memorandum in Support of Jurisdiction to the Supreme Court of Ohio on direct appeal. (*See* ECF #7-1 at PageID 422-31). His first proposition of law again focused exclusively on questions of spillover prejudice resulting from joinder, not on any Fifth vs. Sixth Amendment concerns.

I conclude Mr. Palmer-Tesema has not previously presented this aspect of his first ground for relief to the state courts. A claim not first fairly presented to the state courts cannot be considered in the habeas context because it is procedurally defaulted. Mr. Palmer-Tesema has not

attempted to establish any cause for the default or actual prejudice as a result of the alleged violation of federal law, nor has he demonstrated that failing to consider this claim will result in a fundamental miscarriage of justice.

### C.      Conclusion

In sum, Mr. Palmer-Tesema pursued his improper joinder claim from the trial court to the Supreme Court of Ohio, and thus received the opportunity for full and fair consideration of his claim concerning "bad acts spillover" prejudice. He did not fairly present his "forced to choose" argument under the Fifth and Sixth Amendments regarding improper joinder, and thus it is procedurally defaulted. Therefore, I recommend the District Court **DENY** any relief pursuant to Ground One.

## II.      Grounds Two and Three are not cognizable in federal habeas corpus and so should be dismissed

### A.      Ground Two: Erroneous jury instruction

In Ground Two, Mr. Palmer-Tesema asserts the trial court should not have delivered a "sleep" instruction to the jury. (ECF #1-1 at PageID 30). That instruction was as follows:

> Substantially impaired means a present reduction, diminution or decrease in the victim's ability either to appraise the nature of his conduct or to control his conduct. Voluntary intoxication is a mental or physical condition that could cause substantial impairment.

> Sleep is a mental or physical condition which is sufficient to substantially impair a victim's ability to consent or resist to sexual conduct or contact.

(ECF #7-2 at PageID 1737). He argues this was erroneous because "[t]he facts of the case did not dictate the need for such an instruction . . . ." (ECF #1-1 at PageID 30). The State responds this ground "is solely a matter of state law and is not cognizable on federal habeas review." (ECF #7 at PageID 92). I agree with the State.

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 68 (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle*, 456 U.S. at 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

"Because 'federal habeas corpus relief does not lie for errors of state law,'" federal courts "may grant the writ based on errors in state jury instructions only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (quoting *Lewis*, 497 U.S. at 780). "To warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that required to demonstrate plain error on appeal.'" *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001). Thus, the question on federal habeas review is not whether the state trial court failed to cure a particular ailing jury instruction, but "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Daniels*, 501 F.3d at 741 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

On direct appeal, the Eighth District analyzed Mr. Palmer-Tesema's challenge to the "sleep" jury instruction as follows:

> {¶ 56} In his second assignment of error, Palmer-Tesema contends that the trial court erred by providing the jury with a "sleep" instruction pertaining to the offense of rape.

> {¶ 57} In this case, Palmer-Tesema was charged with rape, in violation R.C. 2907.02(A)(1)(c), which provides, in pertinent part,

[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 58} The state requested that the trial court instruct the jury that "sleep" can constitute "substantial impairment." Over objection, the trial court gave the following jury instruction to the jury on "substantial impairment":

Substantially impaired means a present reduction, diminution or decrease in the victim's ability either to apprise the nature of his conduct or to control his conduct. Voluntary intoxication is a mental or physical condition that could cause substantial impairment.

Sleep is a mental or physical condition which is sufficient to substantially impair a victim's ability to consent or resist to sexual conduct or contact.

{¶ 59} On appeal, Palmer-Tesema contends that the evidence and trial testimony do not support the "sleep" instruction. He maintains that based on the evidence presented and the state's theory of the case — that intoxication was the basis for the victims' impairment — a sleep instruction was improper.

{¶ 60} This court has held that sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct.

{¶ 61} The giving of jury instructions is within the sound discretion of the trial court, and is reviewed for an abuse of discretion. Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder.

A trial court need not instruct the jury where there is insufficient evidence to support an issue. In reviewing a record to ascertain whether sufficient evidence exists to support the giving of an instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.

{¶ 62} A review of the record demonstrates that a sleep instruction was proper because sufficient evidence was presented to support the instruction. Each of the three victims testified that they were either intoxicated or asleep on the nights of the rape. Unlike the circumstances surrounding the rape of S.L., who could not recall any events beyond being at the West End Tavern, both M.C. and N.D. testified that they were awakened by Palmer-Tesema engaging in sexual conduct with them without

30

their consent. Accordingly, the evidence supported a sleep instruction regarding at least two of the victims.

{¶ 63} Moreover, Palmer-Tesema testified that M.C. was not intoxicated that night; rather, he stated that "she was falling asleep as in she was sleepy." Accordingly, by Palmer-Tesema's own testimony and M.C.'s testimony that she was awakened by Palmer-Tesema raping her, the sleep jury instruction was proper because sufficient evidence was presented supporting the instruction.

{¶ 64} Additionally, Palmer-Tesema testified that although he was drunk, he did not believe that N.D. was intoxicated the night he engaged in sexual conduct with her. He testified that during sex with N.D., he became sick and vomited as he walked to the bathroom, where he took a shower. Palmer-Tesema stated that after he showered, he went back to his bedroom and continued to have sex with N.D. He stated, however, that he "believed" that she was awake – "It was very staticky [sic]." Accordingly, by Palmer-Tesema's own testimony and N.D.'s testimony that she was awakened by Palmer-Tesema raping her, the sleep jury instruction was proper because sufficient evidence was presented supporting the instruction.

{¶ 65} We find that the evidence supported both a voluntary intoxication and sleep instruction. The jury was able to consider the circumstances surrounding each rape, including whether each victim was unable to resist or consent because of substantial impairment by virtue of voluntary intoxication or being asleep.

{¶ 66} Accordingly, the trial court did not abuse its discretion by giving the jury a sleep instruction. Palmer-Tesema's second assignment of error is overruled.

(ECF #7-1 at PageID 244-47 (citations and footnote omitted); *see also Palmer-Tesema I*, 2020 WL 1227902, at *8-10).

Because Mr. Palmer-Tesema seeks federal habeas relief based on a claim that the trial court's "sleep" instruction was not supported by, or was in contravention of state law, the claim is not reviewable by this Court. As explained above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. Accordingly, I recommend the Court **DISMISS** Ground Two as not cognizable.

B.       **Ground Three: Mid-trial amendment of the indictment**

In Ground Three, Mr. Palmer-Tesema complains that his due process rights were violated when the State amended Count Four of the indictment, changing the method of sexual contact with N.D. from digital penetration of her vagina to sexual intercourse. (ECF #1-1 at PageID 33-34). The State maintains this is a matter of state law not reviewable on federal habeas corpus. (ECF #7 at PageID 95). Again, the State is correct.

To the extent Mr. Palmer-Tesema raises issues regarding non-compliance with Ohio Criminal Rule 7(D), the Ohio Constitution, or state law, such issues are not appropriate for federal habeas corpus review. A federal court may review a state prisoner's habeas petition only on the grounds that the challenged confinement is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir. 1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). "'[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure'" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)). Only where the error resulted in denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). No such circumstances are present here.

Likewise, to the extent Mr. Palmer-Tesema claims that the State's mid-trial amendment of the indictment violated his right to indictment by grand jury, that claim fails to warrant federal habeas corpus relief. The Ohio Constitution requires a grand jury indictment for state felonies to

be tried in Ohio state courts, while the Fifth Amendment of the United States Constitution requires grand jury indictment for federal felonies to be tried in federal courts. But the Fifth Amendment's protection of the right to indictment by a grand jury does not apply to the States. *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) (citing *Hurtado v. California*, 110 U.S. 516 (1884)); *Williams v. Haviland*, 467 F.3d 527, 531-32 (6th Cir. 2006) (citations omitted); *Lucas v. O'Dea*, 179 F.3d 412, 417 (6th Cir. 1999). Nor is the Ohio grand jury requirement enforceable in habeas corpus, because federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (explaining that "it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts").

Accordingly, I recommend the Court **DISMISS** Ground Three as not cognizable.

## III.     Grounds Four and Five are without merit

### A.     Introduction

In Ground Four, Mr. Palmer-Tesema alleges his appellate counsel was ineffective by not challenging his rape and kidnapping convictions due to insufficient evidence. (ECF #1-1 at PageID 36). This was the first argument he advanced in his Rule 26 application to the Eighth District (ECF #7-1 at PageID 401), which that court rejected (*Id.* at PageID 443-44; *see also Palmer-Tesema II*, 2020 WL 5242459, at *5-6). The State responds that the Eighth District's rejection of this argument means Mr. Palmer-Tesema cannot overcome the double-deferential standard this Court must apply. (ECF #7 at PageID 110-11). It requests that this ground be dismissed. (*Id.* at 111).

Mr. Palmer-Tesema also asserts a claim of ineffective assistance of appellate counsel in Ground Five – that his trial counsel did not fully investigate his case and failed to interview

potential witnesses, prepare for trial, and obtain evidence to present at trial. (ECF #1 at PageID 43). This was the second argument Mr. Palmer-Tesema asserted in his Rule 26 application to the Eighth District (ECF #7-1 at PageID 384), which that court also rejected (*Id.* at PageID 443-44; *see also Palmer-Tesema II*, 2020 WL 5242459, at *5-6). The State again responds that the Eighth District's rejection of this argument means Mr. Palmer-Tesema cannot overcome the double-deferential standard this Court must apply. (ECF #7 at PageID 114). It requests this ground be dismissed. (*Id.*).

**B.    Standards for resolving claims concerning alleged ineffective assistance of trial and appellate counsel**

The Sixth and Fourteenth Amendments guarantee criminal defendants the right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish that counsel's representation was constitutionally ineffective, a habeas petitioner must show that counsel's representation fell below an objective standard of reasonableness based on all the circumstances in the case, such that he did not function as "counsel" guaranteed by the Sixth Amendment, and counsel's deficient performance prejudiced the defense. *Id.* at 687-88. This is a highly deferential standard, and the petitioner must overcome the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

In assessing the effectiveness of appellate counsel, courts similarly apply *Strickland*. *See Smith v. Robbins,* 528 U.S. 259, 285 (2000); *Parks v. Bobby,* 545 F. App'x 478, 481 (6th Cir. 2013). But appellate counsel need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on

34

one central issue if possible, or at most on a few key issues."). Thus, "to succeed on a claim of
ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was
scarcely functioning as counsel at all and that those errors undermine the reliability of the
defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000). Failing to raise
an issue on appeal is only ineffective assistance if there is a reasonable probability that including
the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688, 710-11
(6th Cir. 2004). Stated otherwise, not raising an appellate claim that would have been unsuccessful
is not ineffective assistance of appellate counsel. *Meek v. Bergh*, 526 F. App'x 530, 534 (6th Cir.
2013).

"Counsel's performance is strongly presumed to be effective." *McFarland*, 356 F.3d at 710
(quoting *Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)). Thus, the habeas petitioner must
show that appellate counsel "ignored issues [which] are clearly stronger than those presented."
*Smith*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Moreover, under
AEDPA, this Court must apply so-called "double deference" when evaluating an ineffective
assistance of counsel claim. As the Supreme Court explained:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner
> must show that the state court's ruling on the claim being presented in federal court
> was so lacking in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded disagreement.
>
> * * *
>
> An ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the *Strickland* standard must
> be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
> integrity of the very adversary process the right to counsel is meant to serve. . . .
> Federal habeas courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies,
> the question is not whether counsel's actions were reasonable. The question is

whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter,* 562 U.S. 86, 103, 105 (2011) (citations omitted).

**C.      Ground Four is without merit**

In declining his Rule 26(B) application, the Eighth District analyzed Mr. Palmer-Tesema's

sufficiency-of-the-evidence challenge as follows:

{¶ 5} Palmer-Tesema first argues that appellate counsel was ineffective for not challenging his convictions based on insufficient evidence.

{¶ 6} A reviewing court addressing whether the evidence was sufficient for conviction must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Unlike a manifest weight challenge, a reviewing court does not assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction."

**1. Rape**

{¶ 7} The rape of a substantially impaired person is prohibited by R.C. 2907.02(A)(1)(c). It provides in pertinent part,

No person shall engage in sexual conduct with another * * * when any of the following applies: * * * The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 8} Palmer-Tesema initially claims the state produced insufficient evidence of substantial impairment and insufficient evidence that he knew or should have known about the victims' substantial impairment.

{¶ 9} "Substantially impaired" is not defined in the statute. Therefore, "the term must be given the meaning generally understood in common usage." The state can show substantial impairment by offering evidence "demonstrating a present reduction,

36

diminution or decrease in the victim's ability, either to appraise the nature of [her] conduct or to control [her] conduct."

{¶ 10} Voluntary intoxication is a mental or physical condition that could cause substantial impairment. However, to rise to the level of criminal culpability, " 'a person's conduct becomes criminal * * * only when engaging in sexual conduct with an intoxicated victim when the individual knows or has reasonable cause to believe that the victim's ability to resist or consent is *substantially* impaired because of voluntary intoxication.' " (Emphasis sic.)

> Whether an offender knew or had reasonable cause to believe the victim was impaired may be reasonably inferred from a combination of the victim's demeanor and others' interactions with the victim. Evidence that should have alerted an offender to whether a victim was substantially impaired may include evidence that the victim was stumbling, falling, slurring speech, passing out, or vomiting.

The victim's own testimony may be sufficient to establish substantial impairment.

{¶ 11} This court already determined that the state presented more than sufficient evidence to sustain the verdicts for each count of rape. Therefore, the failure to raise a sufficiency argument cannot result in prejudice, and this portion of Palmer-Tesema's first proposed assignment of error cannot result in reopening. Even so, when we apply the above standards to the facts of this case and the arguments raised in the application for reopening, we reach the same conclusion.

{¶ 12} Palmer-Tesema describes the evidence as insufficient to prove substantial impairment in his application for reopening. But later, he acknowledges the limits of his argument:

> While the aforementioned evidence may be sufficient to establish all three alleged victims' intoxication and may have even been sufficient to show S.L.; [sic] N.D. and M.C. were substantially impaired at the time of the sexual conduct, the law also requires the state to produce legally sufficient evidence to show that Palmer-Tesema knew or had cause to believe that S.L.; [sic] N.D. and M.C. were substantially impaired.

In effect, Palmer-Tesema admits that there exists legally sufficient evidence of substantial impairment, except for the element of his knowledge of substantial impairment.

**a. Evidence of Knowledge of Substantial Impairment of S.L.**

{¶ 13} First we turn to the testimony of Palmer-Tesema's knowledge of S.L.'s substantial impairment.

{¶ 14} Brandon Thompson, Palmer-Tesema's former roommate at a Bay Village home, testified that on the night S.L. alleged that Palmer-Tesema raped her, he observed Palmer-Tesema and another roommate carry S.L. up the stairs to Palmer-Tesema's bedroom because S.L. was incapable of walking. He described her as "pretty drunk," with slurred words, an inability to walk, and "blacked out or so." This testimony alone is enough to satisfy the state's burden of proving Palmer-Tesema's knowledge of S.L.'s substantial impairment. While Palmer-Tesema claims that there is insufficient evidence that he knew or had reasonable cause to belief that S.L. was substantially impaired, this is clearly not the case based on the testimony adduced. Carrying someone who was described as "blacked out" to your bedroom certainly meets the "knows or has reasonable cause to believe" of the victim's substantial impairment for the crime when viewed in a light most favorable to the state.

{¶ 15} Palmer-Tesema claims he did not have sex with S.L. S.L.'s testimony, together with DNA and other evidence obtained during S.L.'s examination by a sexual assault nurse examiner ("SANE") and admitted at trial provide sufficient evidence establishing all the elements of rape of a substantially impaired person when viewed in a light favorable to the state.

**b. Evidence of Knowledge of Substantial Impairment of N.D.**

{¶ 16} N.D. testified that, on November 29, 2017, she was drinking at Palmer-Tesema's house for approximately three to three-and-a-half hours prior to going out to a bar with him, Tia McCord, and another person. They were at the bar drinking together for another two-and-a-half to three hours. She did not remember leaving the bar. McCord testified that N.C. appeared more intoxicated than usual. She appeared very drunk. N.D.'s next memory was talking to McCord in the bathroom at the Bay Village home shared by Palmer-Tesema and his former roommates after arriving there from the bar. She then went to bed alone in Palmer-Tesema's bed fully clothed. She was roused from sleep on her stomach with someone penetrating her from behind. She later observed that it was Palmer-Tesema who was performing various sexual acts on her.

{¶ 17} This court must note the distinction between cases where a defendant is a stranger to the level of intoxication of an individual and those where the defendant had knowledge or planned the intoxication of the victim. We recognized such a distinction in *Foster*:

> This case contrasts with cases where the defendant supplied alcohol that led to a victim's impairment, had knowledge of the alcohol consumed by the victim that led to her impairment, or set into motion a situation where the

victim ended up with the defendant, all the while knowing the victim was impaired.

Here, Palmer-Tesema was aware of the amount of alcohol N.D. consumed and was aware or had reasonable cause to believe that N.D. was substantially impaired based on her state of intoxication, as others with N.D. that night described her as "very drunk."

{¶ 18} The state presented sufficient evidence, when viewed in a light most favorable to it, that Palmer-Tesema knew or should have known of N.D.'s substantial impairment.

**c. Evidence of Knowledge of Substantial Impairment of M.C.**

{¶ 19} M.C. testified on January 14, 2018, she had been drinking throughout the day and went to the Bay Village home for a safe place to sleep. After recounting her movements to various bars throughout the day and how much she had to drink, she remembers being in the kitchen of the home talking to Palmer-Tesema. Palmer-Tesema's former roommate testified that she was drunk when she arrived at the home, even though his other testimony indicated that his interactions with her that night were minimal. She next remembers waking up with her head resting on the toilet in the bathroom. She could not walk normally up the steps, but was "bear-crawling" up the stairs to Palmer-Tesema's bedroom and fell asleep in the bed. She fell asleep fully clothed. She woke up to Palmer-Tesema's digitally penetrating her. She testified that Palmer-Tesema also had oral and vaginal intercourse with her. She testified that she told him to stop numerous times but he did not.

{¶ 20} In this instance, Palmer-Tesema may not have been aware of the amount of alcohol that M.C. had consumed throughout the day, but her testimony regarding her physical state and the observation of others evidenced significant impairment. Further, unlike *Foster*, the state presented evidence of second state of impairment as explained below.

**d. Sleep**

{¶ 21} Palmer-Tesema's application for reopening focuses only on his knowledge of the substantial impairment of the victims based on voluntary intoxication. He does not address a second condition of substantial impairment that is present in this case: Sleep.

{¶ 22} "[S]leep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct. When a person is asleep, he or she is not in a mental condition to resist or consent to the sexual conduct."

{¶ 23} As the state points out in its brief in opposition, N.D. and M.C. testified that they were awoken from sleep by Palmer-Tesema performing various sex acts on them. Both testified that they were asleep and did not consent to such acts. This court affirmed the issuance of a sleep jury instruction in the direct appeal. Further, that instruction was not limited to any specific victim. When viewing this testimony in a light most favorable to the state, it is clear that the state presented sufficient evidence that Palmer-Tesema knew or had reason to believe that these victims were asleep and incapable of consenting to the sexual acts Palmer-Tesema perpetrated on them.

{¶ 24} In order for a claim of ineffective assistance of appellate counsel to succeed, Palmer-Tesema is required to demonstrate that there is a reasonable probability of successfully arguing his proposed assignment of error. Palmer-Tesema does not address the evidence of sleep as a condition of substantial impairment or argue why such evidence is not sufficient to support his rape convictions when viewed in a light most favorable to the state. This, together with the evidence of substantial impairment due to intoxication for S.L., N.D., and M.C. shows that the state presented sufficient evidence for the rape convictions. Therefore, he has not set forth a colorable claim of ineffective assistance of appellate counsel in relation to the sufficiency of the evidence supporting his rape convictions.

**2. Kidnapping**

{¶ 25} Palmer-Tesema also claims that appellate counsel was ineffective for failing to raise a sufficiency-of-the-evidence claim regarding the kidnapping charges that were merged into the rape charges prior to sentencing. However, a sufficiency analysis is only appropriate for each conviction. A conviction requires a finding of guilt and the imposition of sentence.

{¶ 26} Here, because the kidnapping counts merged with the rape counts and the state elected to have Palmer-Tesema sentenced on the rape counts, a sufficiency argument for the kidnapping counts is moot. Palmer-Tesema could not have been prejudiced by appellate counsel's failure to raise this issue. As a result, he has not presented a colorable claim of ineffective assistance of appellate counsel regarding his first proposed assignment of error.

(ECF #7-1 at PageID 436-44 (citations omitted); *see also State v. Palmer-Tesema II*, 2020 WL 5242459, at *2-6)).

I conclude the record in this matter does not establish ineffective assistance of appellate counsel for not asserting a sufficiency of the evidence challenge to Mr. Palmer-Tesema's rape and kidnapping convictions in his direct appeal. Based on the facts found by the Eighth District, as to

which this Court must accord AEDPA deference, sufficient evidence existed to support Mr. Palmer-Tesema's conviction on each of the charged offenses and the sexually motivated offense specifications to each kidnapping charge. (*Id.*). Because appellate counsel cannot be ineffective for not asserting a claim on appeal that itself lacks merit, there is no constitutionally ineffective assistance of counsel. *Jones*, 463 U.S. at 751-52. Thus, Mr. Palmer-Tesema has not shown his appellate counsel's performance included "errors so serious that counsel was scarcely functioning as counsel at all." *McMeans*, 228 F.3d at 682.

For these reasons, I conclude that Ground Four is without merit. I therefore recommend the District Court **DENY** any relief on it.

### D.    Ground Five is without merit

In declining his Rule 26(B) application for reopening, the Eighth District analyzed Mr. Palmer-Tesema's ineffective assistance of appellate counsel challenge to his trial counsel's effectiveness as follows:

> {¶ 27} Palmer-Tesema claims that appellate counsel should have assigned as error ineffective assistance of trial counsel for counsel's failure to investigate the case and present a proper defense.
>
> {¶ 28} "Reversal of a conviction for ineffective assistance of counsel requires that the defendant show first that counsel's performance was deficient and second that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial."
>
> {¶ 29} Palmer-Tesema identifies four potential witnesses that he claims he told trial counsel about. He further claims that trial counsel failed to interview these witnesses or determine whether they could aid the defense. Palmer-Tesema does not indicate where in the record defense counsel was made aware of these potential witnesses or any indication that defense counsel did not interview them and deem their testimony unhelpful to the defense. He does include statements to that effect in his affidavit in support of his application to reopen. Apart from rehashing the joinder arguments made in the direct appeal, the instances that Palmer-Tesema uses to attempt to

41

illustrate trial counsel's ineffectiveness do not appear in the record and therefore cannot successfully be raised on appeal.

{¶ 30} A failure of defense counsel to conduct a thorough investigation of a case is a claim often raised in postconviction proceedings because the argument generally relies on information not contained in the appellate record. While an application for reopening has been described as a specialized postconviction proceeding, the proposed assignments of error must still be based on and supported in the record. "'Nor can the effectiveness of appellate counsel be judged by adding new matter to the record and then arguing that counsel should have raised these new issues revealed by the newly added material.'"

{¶ 31} Even though App.R. 26 provides a method to introduce evidence by way of affidavit and evidentiary hearing, the relief that a court may grant in reopening is limited. App.R. 26(B)(7) provides, "If the application is granted, the case shall proceed as on an initial appeal in accordance with these rules except that the court may limit its review to those assignments of error and arguments not previously considered." If this court were to grant reopening and assign counsel, the remedy would be to allow counsel to argue an assignment of error that could not properly be raised on appeal because it depends on matters that do not appear in the record.

{¶ 32} Further, some claims made in Palmer-Tesema's affidavit in support are contradicted by the record. Palmer-Tesema avers that defense counsel did not meet with him to go over discovery materials.

{¶ 33} While Palmer-Tesema was present in the courtroom, defense counsel requested a continuance of the trial date on the record. After discussing an issue obtaining previously disclosed discovery materials from prior defense counsel, defense counsel stated that "[Palmer-Tesema] and I met on Wednesday for several hours and began to go over that. My schedule, because of a federal court hearing, didn't allow me to meet with him again until Saturday. We did so then. We reviewed all these materials. I met with [Palmer-Tesema] as well as with his mother and his aunt." Defense counsel elaborated:

> As the Court is aware, he is on GPS and home detention so we have to schedule meetings. Obviously it's "Counsel Only" most of them, so I can't give them to him. I have had them since Wednesday. I have reviewed them. And again, I believe the issue here is my client would like more time to digest them to make sure he properly understands his options.

The trial court ultimately granted the continuance to give Palmer-Tesema more time to digest the discovery materials that were reviewed with counsel. Palmer-Tesema did not contradict any of these statements at the time they were made or otherwise

indicate that these meetings did not occur. All of this casts serious doubt on the veracity of the statements made in Palmer-Tesema's affidavit.

{¶ 34} Palmer-Tesema has failed to present a colorable claim of ineffective assistance of appellate counsel for counsel's failure to assign as error an issue that requires reference to matters outside the record on appeal. Therefore, Palmer-Tesema's application for reopening is denied.

(ECF #7-1 at PageID 444-47 (citations omitted); *see also State v. Palmer-Tesema II*, 2020 WL 5242459, at *6-7).

Mr. Palmer-Tesema has not established that the Eighth District's analysis of this argument resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. This is particularly true when the double-deference standard is applied.

For these reasons, I recommend the District Court **DENY** any relief based on Ground Five.

## IV.     Request for evidentiary hearing

Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition "alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Stanford v. Parker*, 266 F.3d 442, 459-60 (6th Cir. 2001) (citing *Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994) (cleaned up)). But a petition may be summarily dismissed and thus a hearing denied if the record clearly indicates the petitioner's claims are either barred from review or without merit. *Id.*

43

Here, a review of the pleadings and transcripts demonstrates the issues Mr. Palma-Tesema presents in his petition can be resolved from the record without the necessity of an evidentiary hearing. I therefore decline his request to conduct an evidentiary hearing.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a COA and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether (i) the petition states a valid claim of the denial of a constitutional right and (ii) the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not required to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Palmer-Tesema has made no substantial showing of the denial of any constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are valid claims of the denial of constitutional rights. Similarly, no procedural ruling appears to be in error. Therefore, I recommend the District Court not grant Mr. Palmer-Tesema a COA as to any ground.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I recommend the District Court **DENY** any relief on Grounds One, Four, and Five, and **DISMISS** Grounds Two and Three as not cognizable in federal habeas corpus. I further conclude that an evidentiary hearing is neither warranted nor necessary. Finally, I recommend the District Court **DENY** Mr. Palmer-Tesema a certificate of appealability as to all grounds.

Dated: February 29, 2024

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).